Hines, Geraldine S., J.
The plaintiffs brought this action pursuant to G.L.c. 30A, §14, appealing the Final Decision of Robert Golledge, Commissioner of the Department of Environmental Protection, in which he decided that the defendant North Point Cambridge Land Company is not required to seek a license to build its proposed project because the Waterways Act, G.L.c. 91, and the regulations promulgated under the Act are not applicable to the subject land. This action is before this court on the plaintiffs’ motion for judgment on the pleadings and the defendants’ cross motions for judgment on the pleadings. For the following reasons, the plaintiffs’ motion is DENIED and the defendants’ cross motions are ALLOWED.

BACKGROUND

Defendant North Point Cambridge Land Company (“North Point”) seeks to create a new neighborhood consisting of approximately five million square feet of residential, office, retail, and park space (“Project”). The Project, as proposed, will benefit the public and surrounding neighborhoods by creating a new park system and multi-use trails, and by improving the roads. Moreover, with Phase II of the Project, North Point will relocate the Lechmere MBTA station and improve track alignments. The intended site of the Project is forty-eight acres of land, most of which is located in East Cambridge, that currently consists of abandoned rail yards and industrial land (“Site”).
The individual plaintiffs are officers, directors, and members of plaintiff Association of Cambridge Neighborhoods, a non-profit corporation that is made up of representatives of Cambridge community groups and associations and that is concerned with improving the quality of life in Cambridge’s residential neighborhoods. Plaintiff Efekta Schools, Inc., is an immediate abutter of the Site.
North Point’s predecessors-in-interest filled the tidelands on the Site pursuant to a license issued in 1962, and the Site contains only filled tidelands and no flowed tidelands. Thirteen acres of the forty-eight *333 acre Site are Commonwealth tidelands. The Site itself is triangular in shape, with the O’Brien Highway to the south, Charlestown Avenue[4] to the east, and the MBTA rail lines and maintenance facility to the north. O’Brien Highway and Charlestown Avenue are interconnected public ways that meet at an intersection with a traflic light. Charlestown Avenue spans the Site for approximately 875 feet, with openings along ninety-three to ninety-five percent of that length allowing pedestrians and vehicles to pass.
No portion of the Site is located within 250 feet of the high water mark, nor is any portion of the Site located within a Designated Port Area. The Charles River Basin, located approximately 400 feet from the Site, is the nearest flowed tideland and is situated on the side of Charlestown Avenue opposite from the Site.[5] Lechmere Canal, the second-nearest flowed tideland, is located approximately 550 feet from the Site on the opposite side of the O’Brien Highway.
On January 13, 2003, the plaintiffs[6] made a Request for Determination of Applicability to the Department of Environmental Protection (“DEP”) in order to determine whether North Point had to obtain a waterways license before building on the Site.[7] North Point submitted a response to the DEP, dated January 29, 2003, in which it noted that the DEP had already determined on two prior occasions that, as the Site and adjacent areas are comprised of landlocked tidelands, they are not subject to G.L.c. 91 or the applicable regulations pursuant to 310 Code Mass. Regs. §9.00.
The DEP’s Waterways Regulation Program (“WRP”) issued its Determination of Applicability on June 12, 2003, finding that the Site is not subject to 310 Code Mass. Regs. 9.00. Specifically, the WRP stated,
The Department finds that the site is located on landlocked tidelands as defined in 310 CMR 9.02. The site has been entirely separated, from any flowed tidelands since January 1, 1984 by the following public ways: a series of privately owned parcels fronting O’Brien Highway including the properties owned by the MBTA at East Street and O’Brien Highway; and Charlestown Avenue to the east (also known as the Gilmore Bridge or Prison Point Bridge). The Department has determined that, even though Charlestown Avenue is an elevated public way, it serves to entirely separate the site from the Charles River, because it is low in elevation and is supported by a significant number of closely-spaced bridge piers and other at-grade structural elements. These structural features distinguish the Charlestown Avenue viaduct from other high-span bridges with few piers, which would not serve to separate filled tidelands. The determination as to whether an elevated public roadway, in existence as of January 1, 1984, qualifies as a landlocking structure is made on a case by case basis by the Department and this decision is not intended to extend to all sites separated from flowed tidelands by a bridge or other elevated public ways.[8]
Therefore, the Department finds that the site is located on landlocked tidelands and, pursuant to 310 CMR 9.04(2), is not within an area subject to jurisdiction. Accordingly, the project site is not subject to licensing and permitting by the Department under 310 CMR 9.00.
(Footnote added, emphasis added.) The plaintiffs appealed this decision, and, at a September 26, 2003, pretrial conference, Administrative Law Judge Francis Nee (ALJ Nee) determined that the only relevant issue was whether the Site was a landlocked tideland.
Pursuant to 310 Code Mass. Regs. §1.01(1 l)(f), the parties moved for summary decision. North Point filed its motion for summary decision on October 17, 2003, arguing that the Site’s landlocked tidelands are entirely separated from flowed tidelands because there are no flowed tidelands on the landward side of the public way; rather, the flowed tidelands in the vicinity are on the opposite side of the interconnected public ways. The plaintiffs filed their motion on November 7, 2003, claiming that the Project required a license because the filled tidelands on the Site are not landlocked tidelands because the Gilmore Bridge does not entirely separate the Site from the Charles River Basin. The DEP joined in North Point’s motion, but filed its own response to the plaintiffs’ motion, noting that the only reasonable interpretation of the regulatory standard is that it requires a two-dimensional analysis.
North Point also filed a response and opposition to the plaintiffs’ motion, contesting the plaintiffs’ request that an “ease of passage” standard be applied when determining whether a partially above-grade public way entirely separates a project site from flowed tidelands. In responding to North Point’s opposition, the plaintiffs disputed North Point’s characterization of their argument; rather than “ease of passage,” the plaintiffs requested that the DEP apply a “physical obstacle” standard by which structures such as high-span bridges with widely-spaced piers and no significant at-grade structural elements do not “entirely separate” filled tidelands.
In his Recommended Final Decision, dated March 2, 2004, ALJ Nee granted summary decision to North Point and the DEP, finding that the Site consisted of landlocked tidelands that precluded the necessity of a waterways license. ALJ Nee further found that elevated public ways, such as Charlestown Avenue, separate filled tidelands from flowed tidelands in the same manner as at-grade public ways do. ALJ Nee gave three reasons for this decision:
First, while the regulations provide a detailed definition of public way, they make no mention of physical barriers separating flowed from filled tide *334 lands. Second, the [DEP] has retracted the statement in the determination of applicability that supported the idea that a physical barrier is necessaiy to accomplish the separation required in the regulations. Third, in the context of the regulations, the obvious meaning of the word “entirely” as it modifies “separated” in the phrase “entirely separated by a public way... from flowed tidelands” is that there is no break in the public way, that is, it does not end and become a private way.
(Ellipses in original.)
On April 23, 2004, defendant DEP Commissioner Robert GoIIedge (“Commissioner”) issued his Final Decision in which he adopted ALJ Nee’s Recommended Final Decision. In rejecting ALJ Nee’s recommendation that “the contested regulations are intended to establish the exception for landlocked tidelands for filled tidelands that are entirely separated from flowed tidelands by any public way or ways including elevated roadways!,]” the Commissioner wrote,
I need not find that a physical separation between filled and flowed tidelands is never relevant in another case, to conclude that this case presents the common circumstance where filled tidelands are landlocked by interconnected public roads which separate the site from flowed tidelands.
(Emphasis in original, footnote omitted.) Such a case-specific analysis “is an appropriate precaution given the complexities of Chapter 91 jurisdiction.” The Commissioner additionally noted that
the use of public ways, regardless of elevation, in the regulations to distinguish between filled tidelands that are “landlocked” - lying landward rather than seaward of identified roads - is consistent with earlier legislative efforts to address jurisdiction over filled tidelands. See Opinions of the Justices to the Senate, June 18,1981,424 N.E.2d 1111 (1981) and 424 N.E.2d 1092 (1981).
(Footnote omitted.)
The plaintiffs are appealing this Final Decision pursuant to G.L.c. 30A, §14.

DISCUSSION STANDARD OF REVIEW

An agency’s decision may be set aside by the court only on the grounds set forth in section 14 of chapter 30A of the General Laws of Massachusetts. Howard Johnson Co. v. Alcoholic Beverages Control Comm’n, 24 Mass.App.Ct. 487, 490 (1987). The grounds for which a court may set aside or modify an agency decision include such reasons as the decision was based upon an error of law, was unsupported by substantial evidence, or was “[arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law.” G.L.c. 30A, § 14(7)(c), (e), (g). The statute directs the court to give “due weight to the experience, technical competence and specialized knowledge of the agency, as well as to the discretionary authority conferred on it.” G.L.c. 14(7); see Cobble v. Commissioner of Dep't of Soc. Servs., 430 Mass. 385, 390 (1999); Flint v. Commissioner of Pub. Welfare, 412 Mass. 416, 420 (1992); Thomas v. Civil Serv. Comm’n, 48 Mass.App.Ct 446, 451 (2000).
The court’s role is not to “make a de novo determination of the facts or draw different inferences from the agency” or to substitute its judgment for that of the agency. Vaspourakan, Ltd. v. Alcoholic Beverages Comm’n, 401 Mass. 347, 351 (1987);Southern Worcester Reg’l Vocational Sch. Dist. v. Labor Relations Comm’n, 386 Mass. 414, 420-21 (1982). The DEP,[9] as an administrative agency, “has considerable leeway in interpreting a statute it is charged with enforcing.” Martínez v. Commissioner of Pub. Welfare, 397 Mass. 386, 392 (1986), quoting Grocery Mfrs. of Arm, Inc. v. Department of Pub. Health, 379 Mass. 70, 75 (1979). Moreover, an agency’s “interpretation of its own rule is entitled to great weight[.]” Norwood Hosp. v. Commissioner of Pub. Welfare, 417 Mass. 54, 58 (1994) (citations omitted). As the parties challenging the DEP’s decision, the plaintiffs bear the burden of establishing the decision’s invalidity. Fisch v. Board of Registration in Med., 437 Mass. 128, 131 (2002); Haverhill Mem. Hosp. v. Commissioner of Div. of Med. Assistance, 45 Mass.App.Ct. 386, 390 (1998); Faith Assembly of God v. State Bldg. Code Comm’n, 11 Mass.App.Ct. 333, 334 (1981).
“Claims filed in the Superior Court. . . pursuant to the standards set forth in G.L.c. 30A, §14 . . . shall be heard in accordance with the ... procedures” set forth in Superior Court Standing Order 1-96. Massachusetts Superior Court Standing Order 1-96 (2005). The court’s “review shall be confined to the record.” Standing Order 1-96, at §5. “Such record ‘shall consist of (a) the entire proceedings, or (b) such portions thereof as the agency and the parties may stipulate, or (c) a statement of the case agreed to by the agency and the parties.” Id. at §2, quoting G.L.c. 30A, §14(4). Here, the entire Administrative Record is before the court.
In accordance with Standing Order 1-96, the plaintiffs brought a motion for judgment on the pleadings, and the defendants brought cross motions for judgment on the pleadings. Any party may move for judgment on the pleadings after the pleadings are closed. Mass.R.Civ.P. 12(c). A Rule 12(c) motion is actually a motion to dismiss that “argues that the complaint fails to state a claim upon which relief can be granted.” Jarosz v. Palmer, 436 Mass. 526, 529 (2002) (quotations omitted). “In deciding a rule 12(c) motion, all facts pleaded by the nonmoving party must be accepted as true.” Id. at 529-30, citing Minaya v. Massachusetts Credit Union Share Ins. Corp., 392 Mass. 904, 905 (1984).

THE TIDELANDS ISSUE

Having set forth the applicable standard of review, I move on to the analysis of the issues before me. *335 Section 14 of G.L.c. 91 provides, in part, that the DEP “may license and prescribe the terms for the construction or extension of a wharf, pier, dam, sea wall, road, bridge or other structure, or for the filling of land or flats . . . but not, except as to a structure authorized by law, beyond any established harbor line, nor . . . beyond the line of riparian ownership.” (Emphasis added.) Further, “no structures or fill may be licensed on private tidelands or commonwealth tidelands unless such structures are necessary to accommodate a water dependent use; provided that for commonwealth tidelands said structures or fill shall also serve a proper public purpose and that said purpose shall provide a greater public benefit than public detriment to the rights of the public in said lands.” G.L.c. 91, §14. Section 18 of G.L.c. 91 sets forth the process a landowner must follow when seeking a license and provides that the DEP “may promulgate regulations for implementation for its authority under this chapter [G.L.c. 91].”
Pursuant to this grant of authority, the DEP adopted 310 Code Mass. Regs. §9.00 “to establish procedures, criteria, and standards for uniform and coordinated administration of the provision of[,]” in part, G.L.c. 91. 310 Code Mass. Regs. §9.01(1). Specifically, the DEP promulgated a regulation providing that “any construction, placement, excavation, addition, improvement, maintenance, repair, replacement, reconstruction, demolition or removal of any fill or structures not previously authorized, or for which a previous grant or license is not presently valid[,]” requires a license from the DEP if the project site is “located in one or more geographic areas specified in” 310 Code Mass. Regs. §9.04. 310 Code Mass. Regs. §§9.03(1), 9.05(l)(a). Among the geographic areas for which licenses are required are “filled tidelands, except for landlocked tidelands[.]” 310 Code Mass. Regs. §9.04(2).
Tidelands are “present and former submerged lands and tidal flats lying between the present or historic high water mark, whichever is farther landward, and the seaward limit of state jurisdiction. Tidelands include both flowed and filled tidelands [.]” 310 Code Mass. Regs. §9.02. Flowed tidelands are “present submerged lands and tidal flats which are subject to tidal action.” Id. Filled tidelands, conversely, are “former submerged lands and tidal flats which are no longer subject to tidal action due to the presence of fill.” Id. There is no dispute that the Site in this case consists of filled tidelands. Landlocked tidelands, which are exempt from the licensing requirements, are
any filled tidelands which on January 1, 1984 were entirely separated by a public way or interconnected public ways from any flowed tidelands, except for that portion of such filled tidelands which are presently located:
(a) within 250 feet of the high water mark, or
(b) within any Designated Port Area. Said public way or ways shall also be defined as landlocked tidelands, except for any portion thereof which is presently within 250 feet of the high water mark.

Id.

(Emphases added.)
The plaintiffs appeal the Commissioner’s Final Decision in which he concluded that North Point’s Project does not require a license because the Site consists of landlocked tidelands. There is no dispute that the Site has not significantly changed since January 1, 1984; moreover, it is undisputed that the Site is neither within two hundred fifty feet of the high water mark nor within a Designated Port Area. Accordingly, all that remains at issue is whether the filled tidelands on the Site are entirely separate from any flowed tidelands, thereby making its tidelands landlocked and the Project exempt from the license requirement.

A. DEP’s Authority to Promulgate Regulations

The plaintiffs argue that the DEP’s grant of authority does not extend to making exemptions from the licensing requirements where the enabling statute does not provide for such exemptions.[10] As noted above, in G.L.c. 91, §18, the Legislature provided the DEP with the authority to promulgate regulations concerning licensing. Section 2 of G.L.c. 91, in setting out the duties of the DEP, further states that the DEP “shall act to preserve and protect the rights in tidelands of the inhabitants of the commonwealth by ensuring that the tidelands are utilized only for water-dependent uses or otherwise serve a proper public purpose.” See Fafard v. Conservation Comm’n of Barn-stable, 432 Mass. 194,201 &n.l2 (2000) (interpreting G.L.c. 91, §2, to refer to DEP despite provision in G.L.c. 91, §1, that limits G.L.c. 91, §2, to department of environmental management); 310 Code Mass. Regs. §9.01 (2)(b) (using exact words from quoted statement, above, as one of DEP’s purposes served by 310 Code Mass. Regs. §9.00). Exempting landlocked tidelands from licensing requirements, the plaintiffs claim, is inconsistent with this statutory duly.
An “agency’s powers are shaped by its organic statute taken as a whole and need not necessarily be traced to specific words.” Levy v. Board of Registration & Discipline in Med., 378 Mass. 519, 524 (1979), quoting Commonwealth v. Cerveny, 373 Mass. 345, 354 (1977). “A regulation is invalid if it conflicts with the authorizing statute.” Morris v. Commonwealth, 412 Mass. 861, 864 (1992); see Thomas v. Commissioner of the Div. of Med. Assistance, 425 Mass. 738, 746 (1997) (holding court “must apply all rational presumptions in favor of the validity of the administrative action and not declare it void unless its provisions cannot by any reasonable construction be interpreted in harmony with the legislative mandate”). Moreover, “ [i]f the regulations exceeded . . . [the agency’s] statutory authority, then they would be arbitrary and *336 capricious on their face in that they would by definition be unrelated to the achievement of any statutoiy goals.” Massachusetts Fed’n of Teachers, AFT, AFL-CIO v. Board of Educ., 436 Mass. 763, 776 (2002), quoting American Family Life Assurance Co. v. Commissioner of Ins., 388 Mass. 468, 476 (1983). Here, the Legislature gave the DEP authority over tideland licenses, stating that the DEP “may license and prescribe the terms” of such licenses. G.L.c. 91, §14 (emphasis added). The Legislature further instructed the DEP that it “may promulgate regulations” concerning the exercise of that authority. G.L.c. 91, §18 (emphasis added).
“When the Legislature delegates to an administrative agency a broad grant of authority [such as in this case,] . . . the administrative agency generally has a wide range of discretion in establishing the parameters of its authority pursuant to the enabling legislation.” Massachusetts Federation of Teachers, AFT, AFL-CIO, 436 Mass, at 774, quoting Levy v. Board of Registration & Discipline in Med., 378 Mass. 519, 525 (1979). The Legislature instructed the DEP that it “may license and prescribe the terms for the construction” on tidelands, and placed limits on the DEP’s discretion by defining its duties as “preservfing] and protect(ing) the rights in tidelands of the inhabitants of the commonwealth by ensuring that the tidelands are utilized only for water-dependant uses or otherwise serve a proper public purpose.” G.L.c. 91, §2. Water-dependent uses are
those uses and facilities which require direct access to, or location in, marine or tidal waters and which therefore cannot be located inland, including but not limited to: marinas, recreational uses, navigational and commercial fishing and boating facilities, water-based recreational uses, navigation aids, basins, and channels, industrial uses dependent upon water-borne transportation or requiring large volumes of cooling or process water which cannot reasonably be located or operated at an inland site.
G.L.c. 91, §1 (emphasis added).
The DEP has not exceeded its authority by exempting landlocked tidelands from the licensing requirements. First “(t]he word ‘may’ is one ‘of permission and not of command!,]’ ” thus the Legislature’s use of “may” in G.L.c. 91, §14, enables the DEP to grant licenses at its discretion. Cohen v. Board of Water Comm’rs, Fire Dist. S. Hadley, 411 Mass. 744, 751 (1992), quoting Brennan v. Election Comm’rs of Boston, 310 Mass. 784, 786 (1942). The DEP exercised that discretion in promulgating a regulation that excludes a single type of tideland from the licensing requirements, a determination that is consistent with G.L.c. 91, §2, in that it is unlikely that any construction on landlocked tidelands would be for a water-dependent use, given their distance from the high water mark and their probable inland location.[11] See G.L.c. 91, §1 (defining water-dependant uses as uses that require direct access to water and cannot be located inland).
Second, the DEP’s broad discretion “extends to determining, at least by regulation generally applicable and consistent with the enabling legislation, what . . . ‘represents a fair threshold for [the] imposition of . . . regulatory burdens’ upon members of the public.” Brooks v. Architectural Barriers Bd., 14 Mass.App.Ct. 584, 588 (1982) (alterationin original). The landlocked tidelands exemption represent such a fair threshold because it limits the DEP’s waterways jurisdiction over filled tidelands that are far enough from flowed tidelands that they have no water-dependent use. Finally, the DEP “by regulation may decline to exercise its full potential jurisdiction!,]” thus this exemption limiting the DEP’s jurisdiction over tidelands is proper and this use of its authority was within its discretion. Id. at 589 (footnotes omitted).
Accordingly, 310 Code Mass. Regs. §9.04(2) is consistent with the duties the Legislature set forth for the DEP in G.L.c. 91, §2, and the DEP did not exceed its statutoiy authority in promulgating it.

B. Application of Regulation

Given the validity of the exemption in 310 Code Mass. Regs. §9.04(2), this courtnow turns to the DEP’s interpretation of that regulation. The plaintiffs argue that the Site does not constitute landlocked tidelands, thus it is not exempt from the license requirements. In support of their argument, the plaintiffs rely on the fact that ninety-three to ninety-five percent of the 875 feet of Charlestown Avenue is elevated and “open to passage at the ground level.” As a consequence, the plaintiffs claim, there is no physical separation between the Site and the Charles River Basin, thereby precluding the Site’s filled tidelands from being landlocked. [12]
Filled tidelands are landlocked if they are entirely separated from flowed tidelands by a public way or interconnected public ways.[13] 310 Code Mass. Regs. §9.02. ALJ Nee concluded, and the Commissioner agreed, that Charlestown Avenue’s elevation does not prevent it from separating the Site from the Charles River Basin because the regulation does not require a physical barrier between the filled and flowed tidelands. The fact that “[a]ny straight line drawn on the [Site] plan from the flowed tidelands to the south and east of the [S]ite to the filled tidelands on the [S]ite would have to cross one of the two public ways” is sufficient to satisfy the “entirely separated” requirement.
Courts must defer to “an agency’s findings of fact and interpretation of a statute (or regulations) within its charge.” Conservation Comm’n of Falmouth v. Pacheco, 49 Mass.App.Ct. 737, 740 n.3 (2000).
That deference prevents a court from interfering with an administration determination (regulatoiy or adjudicatoiy) unless it is shown to be arbitrary *337 or capricious ... or is supported by “no ground which ‘reasonable men might deem proper’ to support it[;]”... or is devoid “of any conceivable ground upon which the action] may be upheld];]” ... or is impossible “by any reasonable construction [to] be interpreted in harmony with the legislative mandate.”
Id. (second and fourth alterations in original, citations omitted). Therefore, as the regulations do not define “entirely separated,” this court must defer to the DEP’s interpretation of the, phrase unless “the ‘interpretation is patently wrong, unreasonable, arbitrary, whimsical, or capricious.’ ” Box Pond Ass’n v. Energy Facilities Siting Bd., 435 Mass. 408, 416 (2001), quoting TBI, Inc. v. Board of Health of N. Andover, 431 Mass. 9, 17 (2000).
As noted, to be landlocked, a public way or interconnected public ways must entirely separate the filled tidelands from flowed tidelands. The verb “to separate” means to isolate or to “become severed . . . [or] divided into parts or components!.]” Webster’s II New College Dictionary 1007 (2001). This verb is modified by the adverb “entirely” which is defined as completely, wholly, solely, and exclusively. Id. at 376. Accordingly, the regulations require that the public way must completely isolate or divide the filled tidelands from flowed tidelands; there is no requirement, either explicitly or implicitly, that the public way serve as a physical barrier.
The Commissioner’s application of a two-dimensional test to determine whether the filled tidelands are entirely separated from flowed tidelands is consistent with the common sense meaning of the phrase “entirely separated” and is reasonable in relation to the other portions of the “landlocked tidelands” definition. 310 Code Mass. Regs. §9.02. Namely, the definition requires that, to fall into the exemption, the filled tidelands cannot be within 250 feet of the high water mark or within any designated port area. Both of those elements are easily determined by conducting a two-dimensional test involving a study of the site plan. Thus, it would be unreasonable to interpret the regulation in such a way as to necessitate a site visit to determine the “entirely separated” element.
Moreover, the Commissioner’s comment that case-specific analysis is appropriate suggests that certain details concerning the Site were relevant to the decision that Charlestown Avenue’s elevation does not prevent the Site from being landlocked. Specifically, the Site’s filled tidelands are adjacent to filled tidelands, not flowed tidelands; the closest flowed tidelands on the Charlestown Avenue side of the Site are 400’ from the Site. Requiring North Point to obtain a license for the Project on this Site would not further the DEP’s goal of ensuring that certain tidelands are used only for water-dependent purposes.
Accordingly, the Commissioner’s Final Decision is affirmed.
C. Plaintiffs’ Additional Arguments
Although the Final Decision is affirmed, the plaintiffs have made additional arguments that warrant a brief discussion.

1. Commissioner’s Citation to Opinions of the Justices

The plaintiffs take issue with the Commissioner’s citation to two Opinion of the Justices decisions in his Final Decision. 383 Mass. 927 (1981); 383 Mass. 895 (1981). The Commissioner wrote, “In addition, I note that the use of public ways, regardless of elevation, in the regulations to distinguish between filled tidelands that are ‘landlocked’ - lying landward rather than seaward of identified roads - is consistent with earlier legislative efforts to address jurisdiction over filled tidelands.’’ (Emphasis added.) He then utilized a “see” cite followed by the citations for the two opinions. “See” is used when the “[c]ited authority supports the proposition. ‘See’ is used instead of ‘[no signal]’ when the proposition is not directly stated by the cited authority but obviously follows from it; there is an inferential step between the authority cited and the proposition it supports.” The Bluebook: A Uniform System of Citation 22-23 (Columbia Law Review Ass’n et al. eds., 17th ed. 2000) (emphasis in original).
In each of the opinions, the Supreme Judicial Court (“SJC”) responded to questions the Senate propounded regarding pending bills concerning tidelands within Boston. Opinion of the Justices, 383 Mass. at 928; Opinion of the Justices, 383 Mass, at 897. The proposed legislation,[14] never passed, sought to eliminate the Commonwealth’s vestigial rights in Boston tidelands lying landward of a certain point, designated the “1980 Line.” Id. Without delving too deeply into either opinion, this court notes that the SJC agreed that “the Legislature has the authority to surrender any so called vestigial or residual public rights in lawfully filled, formerly submerged, land . . . because [n]either the public nor the Commonwealth has a continuing interest in these tidelands in the nature of a public trust[.]” Opinion of the Justices, 383 Mass. at 904, 910.
Further, while the proposed bill provided “a proper legislative policy!, t]he details of implementation of that policy [we]re left to the Secretary of the Executive Office of Environmental Affairs. The standards under which the secretary must act [we]re . . . constitutionally adequate to define the limits of his exercise of the authority that would be delegated to him by” the proposed bill. Opinion of the Justices, at 938. The SJC concluded that there was no constitutional barrier to the Legislature’s right “to delegate to an administrative official or agency the authority to make determinations concerning lands and easements taken or acquired!.]” Id.
The SJC therefore acknowledged not only that the Legislature had the authority to eliminate the *338 Commonwealth’s rights in landlocked tidelands in a specified area subject to certain conditions, but also that the Legislature could delegate to an administrative agency the implementation of that authority. Such a finding is consistent with the Legislature’s delegation to the DEP the discretion to license uses of certain tidelands if consistent with its enumerated duties. See G.L.c. 91, §2. The Commissioner did not err in citing to these opinions as inferential support for his statement.

2. Prior License

In 1962, North Point’s predecessors-in-interest obtained a license to fill the Site. The license contained an express condition that “no structures shall be placed on the fill except with further license authorization from the Department of Public Works, or its successors[.]” Section 18 of G.L.c. 91 sets out the procedure for obtaining a license. The license itself must “state the conditions on which it is granted, including, but not limited to the specific use to which the licensed structure or fill is restricted[.]” G.L.c. 91, §18. The statute further provides that “[a]ny changes in use or structural alteration of a licensed structure or fill, whether said structure or fill first was licensed prior to or after the effective date of this section, shall require the issuance by the department of a new license in accordance with the provisions and procedures established in this chapter.” This provision, the plaintiffs argue, renders unlawful the landlocked tidelands exemption, or, alternatively, requires that the exemption not apply to the Site because of its 1962 license.
As North Point and the DEP explain, the “changes in use” provision merely instructs the applicant that G.L.c. 91 licenses are not intended to grant the applicant the unfettered ability to use the tidelands in any way he wishes. Rather, the licenses are to be issued for specified uses and if the applicant later changes that use, he will have to apply for a new license “in accordance with the provisions and procedures established” in G.L.c. 91. Here, with the Project, North Point intends a change in use of the Site by building structures upon it. The Site, having been filled in 1962, now contains landlocked tidelands that are exempt from the licensing requirements. 310 Code Mass. Regs. §9.04(2). This result is consistent with the “prior license” provision in G.L.c. 91, §18, because, as discussed above, promulgating this exemption is within the DEP’s discretionary authority that extends to all proposed uses, not just “new uses.” See 310 Code Mass. Regs. §9.05(l)(a) (requiring license for construction of structures not previously authorized or for which previous license is no longer valid). Thus, requiring an applicant to seek a new license for a change in use is the functional equivalent of requiring an applicant to seek a license for a new use.

ORDER

For the foregoing reasons, the plaintiffs’ motion for judgment on the pleadings is DENIED and the defendants’ cross motions for judgment on the pleadings are ALLOWED. The Commissioner’s Final Decision is AFFIRMED.

Nhe portion of Charlestown Avenue that borders the Site is the Gilmore Bridge.

The area between Charlestown Avenue and the Charles River Basin is filled tidelands.

All of the plaintiffs named in this case were involved in the administrative actions discussed below with the exception of Efekta Schools, Inc. That notwithstanding, and for the sake of clarity and consistency, this court will continue to refer to the plaintiffs collectively as “plaintiffs.”

Section 9.06(1) of title 310 of the Code of Massachusetts Regulations provides that “[a]ny person who desires a determination whether 310 CMR 9.00 presently applies] to any area of land or water, or any activity thereon, may submit to the [DEP] a request for a determination of applicability.”

In his Recommended Final Decision, discussed below, the administrative law judge notes that the DEP retracted this paragraph and “assert[ed] that the proper approach is to determine whether there is a ‘continuous public way,’ that is, whether there is a break in the public way or interconnected public ways that separate the flowed from filled tidelands.”

The plaintiffs named the Commissioner himself, not the DEP, as a party to this action. This court notes that references to the DEP in this decision include the Commissioner.

The plaintiffs also claim that a “prior license” provision in G.L.c. 91, §18, renders this exemption invalid. This argument is discussed briefly below in a separate section.

For tidelands, the high water mark is “the present mean high tide line, at established by the present arithmetic mean of the water heights observed at high tide over a specific 19-year Metonic Cycle . . . and shall be determined using hydrographic survey data of the National Ocean Survey of the U.S. Department of Commerce!.]” 310 Code Mass. Regs. §9.02.

The plaintiffs fail to note the acknowledgment in that same study, set forth in the Administrative Record, that the land underneath Charlestown Avenue and on both sides of Charlestown Avenue is filled tidelands.

This court will not repeat the other requirements, that the filled tidelands are neither within two hundred fifty feet of the high water mark nor in a designated port area, tinless relevant because those aspects of the definition are not at issue.

Contraiy to the plaintiffs’ argument, the proposed legislation did not concern G.L.c. 91; rather, it proposed G.L.c. 91A as a new chapter to the General Laws.